ORIGINAL

Approved: _____
MARTIN S. BELL
Assistant United States Attorney

19MAG3058

Before:  THE HONORABLE KATHARINE H. PARKER
         United States Magistrate Judge
         Southern District of New York

------------------------------------X
                                    :
UNITED STATES OF AMERICA            :       **SEALED COMPLAINT**
                                    :
              - v -                 :       Violations of
                                    :       15 U.S.C. §§ 80b-6,
RICHARD DIVER,                      :       80b-17; 18 U.S.C. §§
                                    :       1343, 2
              Defendant.            :
                                    :       COUNTY OF OFFENSE:
                                    :       NEW YORK
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss:

    MELISSA S. ATKIN, being duly sworn, deposes and says that she is a Postal Inspector with the United States Postal Inspection Service, and charges as follows:

### COUNT ONE
### (Investment Advisor Fraud)

    1.    Between in or about 2017 and in or about December 2018, RICHARD DIVER, the defendant, acting as an investment advisor with respect to clients of a particular asset management company, willfully and knowingly, used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifices to defraud clients and prospective clients; and (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients, to wit, DIVER misappropriated clients' funds for his own personal use and took steps to hide this misappropriation by sending clients false information with respect to their assets under management.

(Title 15, United States Code, Sections 80b-6, 80b-17;
and Title 18, United States Code, Section 2.)

## COUNT TWO
## (Wire Fraud)

2. Between in or about 2011 and in or about December 2018, RICHARD DIVER, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, for the purpose of executing a scheme to defraud the company that employed him, DIVER, through the use of interstate wires, misappropriated millions of dollars from the asset management company at which he was employed.

(Title 18 United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am currently employed as a Postal Inspector with the United States Postal Inspection Service, and have been so employed for over six years. I have personally been involved in the investigation of this matter. My responsibilities as a Postal Inspector have included the investigation of securities fraud, mail and wire fraud, and other financial crimes.

4. I base this affidavit on my personal knowledge, as well as on my personal involvement in the investigation of this matter, including, but not limited to, conversations with law enforcement agents and others, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Relevant Entities and Persons

5. At all times relevant to this Complaint, Company-1 was (and remains) an asset management company headquartered in New York, New York in the borough of Manhattan. The company markets its investment planning and wealth management services

to individuals, family offices, endowments, and other institutions, and manages its customers' assets through individual managed accounts. Assets of Company-1 clients are generally held at one of two custodial entities, Custodian-1 and Custodian-2. Company-1 was (and remains) registered as an investment adviser with the United States Securities and Exchange Commission (the "SEC").

6. At all times relevant to this Complaint, Individual-1 was the Chairman, Chief Investment Officer, and Chief Executive Officer of Company-1. At all times relevant to this Complaint, unless otherwise noted, Individual-1 held approximately 91 percent of the equity ownership interest in Company-1.

7. At all times relevant to this Complaint, unless otherwise noted, RICHARD DIVER, the defendant, was the Chief Operating Officer and Senior Vice President of Company-1. At all times relevant to this Complaint, unless otherwise noted, DIVER held approximately 9 percent of the equity interest in Company-1.

### Overview of DIVER's Scheme

8. Based on the information set forth herein, I respectfully submit that there is probable cause to believe that, beginning in or about 2011, RICHARD DIVER, the defendant, defrauded Company-1 out of millions of dollars by means of the company's payroll, and that beginning in 2017, DIVER began also to defraud the clients of Company-1, causing hundreds of thousands of dollars in client funds to be fraudulently debited from their custodial accounts and rerouted to his personal account by means of excess payroll payments.

### DIVER's Theft of Payroll and Billing Funds

9. I have interviewed Individual-1. I have also reviewed a statement Interview-1 prepared with his attorney and submitted to the SEC under oath. From the interview and my review of the statement, I am aware of the following:

a. At all times relevant to this Complaint, the responsibilities of RICHARD DIVER, the defendant, as Chief Operating Officer included sole responsibility for Company-1's payroll functions. DIVER and Individual-1 were signatories on the bank account associated with payroll, but DIVER was the only person who saw each of the individual payroll payments. DIVER

3

handled Company-1's payroll responsibilities through a third-party payroll vendor (the "Payroll Vendor"). DIVER also, as Chief Operating Officer, had access to the e-mails of Company-1's employees.

b. At all times relevant to this Complaint, DIVER was also in charge of billing Company-1's clients. DIVER and a member of Company-1's staff, Employee-1, were the only individuals who had direct access to Company-1's client billing system. Company-1 entered into written investment advisory agreements with each of its clients. Pursuant to those agreements, Company-1 charged an annual advisory fee, generally charging a fixed percentage based on the value of the client's assets under Company-1's management, payable quarterly. Each quarter, Employee-1 created a valuation of the clients' portfolio and then applied the fixed fee percentage to each client's account. Company-1 then charged the client that amount for the next quarter, a three-month period. Typically, Company-1's clients authorized Company-1 to deduct its investment advisory fees directly from the clients' custodial accounts at Custodian-1 and Custodian-2.

c. In or around November 2018, Individual-1 was contacted by an individual ("Individual-2") who had introduced several clients to Company-1. Individual-2 told Individual-1, in sum and substance, that certain of the clients Individual-2 had referred to Company-1 reported that they had been overbilled by Company-1. After hearing this information, Individual-1 asked DIVER to investigate the matter, and DIVER later told Individual-1 that those accounts had, in fact, been inadvertently and mistakenly overbilled.

d. On or about December 5, 2018, Individual-1 received another inquiry from a client concerning overbilling in two accounts held by that client.

e. On or about December 7, 2018, Individual-1 met with DIVER in person, relayed the report of additional overbilling to him, and questioned him as to the apparent unexplained overbilling of multiple Company-1 client accounts. At that moment, DIVER revealed, in substance and in part, that he had overbilled clients by approximately $300,000 during the years 2017 and 2018 in order to personally enrich himself. DIVER relayed that he had no ability to make clients whole, and claimed that the funds he had stolen were consumed by his own "wild" personal spending.

4

f. On or about December 10, 2018, Individual-1 asked DIVER to prepare an accounting of the overbilling he had caused in Company-1's accounts.

g. That day, DIVER confessed to Indvidual-1 that DIVER had additionally misappropriated approximately $4 million from Company-1 itself by fraudulently paying himself approximately $600,000 per year in addition to his base salary (including bonus) of $350,000 per year for the years 2011 to 2018. DIVER effected these payments by instructing the Payroll Vendor to pay him an inflated and unauthorized salary.

h. On or about December 12, 2018, Company-1 and DIVER entered into an agreement in writing whereby DIVER surrendered all of his shares in Company-1 to Company-1 for no consideration.

i. On or about December 14, 2018, DIVER gave a written accounting to Individual-1 in the form of a spreadsheet (the "Spreadsheet"). The spreadsheet indicated that DIVER had overbilled approximately 304 clients in the years 2017 and 2018 in the aggregate amount of $643,000. DIVER was formally terminated for cause, and his access to Company-1's business premises and e-mail was revoked.

j. Individual-1 is familiar with the defrauded clients, and is aware that numerous of the client are located outside the state of New York.

k. In or about March 2019, Individual-1 reviewed documentation from the Payroll Vendor, which indicated how much DIVER had been paid each year from 2011 to 2018. The amounts vastly exceeded what DIVER was authorized to have made at Company-1 during those years, inclusive of salary and bonus. Using conservative estimates of what those figures were, Individual-1 estimated that over the 2011-2018 period, DIVER arranged to pay himself over $4.5 million more than he was authorized to have received.

10. I have reviewed the Spreadsheet. It indicates that RICHARD DIVER, the defendant, overbilled clients by $643,000. The metadata from the file also indicates that the author of the spreadsheet was DIVER. I have also reviewed a written calculation by Individual-1 concerning DIVER's actual pay between 2011 and 2018, and checked those sums against supporting documentation from the Payroll Vendor. Using Individual-1's estimates of authorized compensation, it appears

5

to confirm that DIVER overpaid himself by in excess of $4.5 million during that period.

11. I have spoken to Employee-1. From my interview of Employee-1, I have learned the following:

    a. Employee-1's responsibilities included assisting RICHARD DIVER, the defendant, with billing and other clerical and client liaison work.

    b. When Company-1 billed on a quarterly basis, DIVER directed her to bill the clients, and she then obtained the amounts in assets under management for each client and applied the applicable fixed rate. Once the fee was calculated, she created a bill and debited the invoiced account from the clients' custodial accounts.

    c. At one point in or around 2017, DIVER began to approach Employee-1 outside of the regular billing cycle and asked her to run bills for a list of clients. She did so, applying the same formula that she did with regular billing. Although the regular quarterly bills were sent out to clients, DIVER had her give the bills generated through these off-cycle billings to him personally. Employee-1 did not question the off-cycle billing, and DIVER did not give her an explanation beyond stating that he needed her to bill those clients. Employee-1 believes that this practice began with the third quarter of 2017 and continued through 2018 until shortly before DIVER was terminated.

    d. Most of the client fees were debited directly from the client's account at Custodian-1 or Custodian-2. In the few instances in which the fee was paid by check, Employee-1 gave the check to DIVER.

    e. Under the standard quarterly billing procedure in place at Company-1 in 2017 and 2018, when the billing system generated a bill it became part of a quarterly report document that Employee-1 sent to clients along with a cover letter signed by Individual-1. Employee-1 received the letters from Individual-1, added the report to it, and then mailed them to clients. With the off-cycle requests made by DIVER, by contrast, there was no report or letter matched to the bill and mailed to the client, and she was instructed to give the bill to DIVER. When DIVER asked her to do these off-cycle billings, he did not mention a letter or a full report.

6

f. During the period in which the overbilling took place, the legitimate, quarterly bills sent out by Company-1 were inaccurate, in that they did not include the money that had been deducted as a result of intervening off-cycle billing ordered by DIVER.

12. I have reviewed a report provided by Company-1 by a forensic accountant Company-1 retained after the departure of RICHARD DIVER, the defendant, to review its books and records. From my review of the report, I have learned that the forensic accountant concluded that during 2017 and 2018, DIVER caused Company-1 to overbill its clients by approximately $748,497 through the means described above.

13. I have reviewed bank statements provided by counsel for Company-1 that were found on the work computer of RICHARD DIVER, the defendant. The bank statements were for personal bank accounts belonging to DIVER. From my review of those statements, I am aware that on a single day in November 2018, DIVER received two electronic deposits into a personal account via the Payroll Vendor, totaling over $17,000. DIVER then transferred $2,500 of that money into a second personal account. Four days later, after no activity was recorded in that second account, DIVER withdrew $500 in cash from that account via an ATM machine physically located in New Jersey.

**The Consensually Monitored Call**

14. On or about March 27, 2019, Individual-1 participated in a consensually monitored and recorded telephone conversation. Individual-1 called RICHARD DIVER, the defendant, at his personal cellular phone number. I listened to and recorded the telephone call. During the call, I witnessed the following:

a. Individual-1 asked DIVER whether he had told his wife about "the overbilling you did in the last two years." DIVER replied, "No, I did not. I haven't really told her much."

b. Individual-1 said, "You told us about the overbilling you did in '17 and '18, and I know you did the spreadsheet and all of that, and then you told me that you started taking the additional payroll distributions beginning in 2011. Is there anything else I need to know about other than that? Did you do any of this in '16 or '15?" To which DIVER responded, "No. Not at all. No. Absolutely not." DIVER did not otherwise deny the overbilling conduct in 2017 and 2018.

7

          c.    Individual-1 broached the issue of restitution. Individual-1 said, "By my calculation, the unauthorized payroll you took between '11 and '18 totals up to four and three-quarters million dollars. By the way, the client overbilling was significantly greater than your spreadsheet because you forgot about fee changes and canceled account refunds, which we picked up, so that brings that total up over $700,000. Now, we're talking about a lot of money here." DIVER said, "Mmmm-hmmmm." Individual-1 mentioned a document that I am aware he had found on DIVER's computer, a form concerning a purported real estate transaction that represented that DIVER had personal net assets in excess of $9 million. DIVER said, "That's not true," and that "I just made that up on a form that I never used." Individual-1 then said, "Well, look, at some point we're gonna have to talk about restitution, so, you know, think about that, because maybe that'll be another conversation." DIVER responded, "I understand."

    WHEREFORE, deponent prays that defendant be imprisoned, or bailed, as the case may be.

_____
MELISSA S. ATKIN
Postal Inspector
United States Postal Inspection Service


Sworn to before me this
**27** day of March, 2019

_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK